Sarah Elizabeth Spencer, #11141
SPENCERWILLSON, PLLC
66 E. Exchange Pl., Suite 208
Salt Lake City, UT 84111
Telephone and Facsimile: (801) 346-8120
Sarah@SpencerWillsonPLLC.com
*Attorney for Plaintiff Yuyang Qiu*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| YUYANG QIU,<br><br>        Plaintiff,<br><br>v.<br><br>ROSEMAN UNIVERSITY OF HEALTH SCIENCES; RACHEL NOVAK, individually; CLARK DANA, individually; LAURA KADILLAK, individually; and JONATHAN FAIRBANKS, individually,<br><br>        Defendants. | **COMPLAINT AND JURY DEMAND**<br><br>Case No. _____<br>Judge _____ |

Plaintiff Yuyang Qiu ("Plaintiff" or "Ms. Qiu"), by and through undersigned counsel, brings this Complaint against Defendants Roseman University of Health Sciences ("Roseman" or the "University"), Rachel Novak, Clark Dana, Laura Kadillak, and Jonathan Fairbanks, as follows:

### NATURE OF THE ACTION

1. This civil rights action arises from Roseman University's deliberate campaign to silence and punish a Chinese-American female dental student after she reported harassment and patient safety concerns. Within 26 days (7 working days) of Ms. Qiu's protected complaints, Roseman initiated discipline based on a fabricated allegation—and when that allegation collapsed under the weight of exculpatory evidence, Roseman pivoted to 27 new accusations that its own Dean admitted "may or may not be true. We don't know."

2. The facts tell the story. On January 11, 2026, the supervising faculty member documented that he "Told student to go ahead and treat #31"—the very treatment Roseman accused Ms. Qiu of performing without authorization. When confronted with this evidence,

1

Roseman did not exonerate Ms. Qiu. Instead, it abandoned the original charge without findings and substituted a 27-allegation "Action Plan" demanding Ms. Qiu confess to unverifiable accusations or face expulsion. When Ms. Qiu refused to sign a document she knew to be false, Roseman suspended her indefinitely.

3.      This is not academic discipline. This is retaliation dressed in academic clothing. The sequence is unmistakable: protected complaint, fabricated charge, exculpatory evidence, pivot to unverifiable allegations, coerced confession, indefinite suspension. Each step reveals pretext; together, they establish intentional discrimination and retaliation under Title VI, Title IX, 42 U.S.C. § 1981, and Utah contract law.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question) over Plaintiff's Title VI, Title IX, and 42 U.S.C. § 1981 claims.

5.      This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's state law claims arising from the same case or controversy.

6.      Venue is proper under 28 U.S.C. § 1391(b). Roseman operates substantial facilities in Utah, and all events giving rise to these claims occurred at Roseman's College of Dental Medicine in South Jordan, Salt Lake County, Utah.

## PARTIES

7.      Plaintiff Yuyang Qiu is a natural person and Utah resident. Ms. Qiu is female. Ms. Qiu is Asian. Ms. Qiu's national origin is Chinese. At all relevant times, Ms. Qiu was a D2 dental student at Roseman University College of Dental Medicine.

8.      Defendant Roseman University of Health Sciences is a private university incorporated in Nevada, operating a College of Dental Medicine at 10894 South River Front Parkway, South Jordan, Utah 84095. Roseman receives federal financial assistance and is subject to Title VI and Title IX. Roseman is a Title IV participating institution (FAFSA School Code 040653; NCES IPEDS Unit ID 445735) that administers federal student aid programs including Pell Grants, Federal Supplemental Educational Opportunity Grants, Federal Work-Study, Direct

2

Subsidized and Unsubsidized Loans, and Grad PLUS Loans. According to federal data, approximately 69% of Roseman's undergraduate students receive federal student loans. Roseman has also received direct federal grants from the U.S. Department of Education, including over $2 million in Higher Education Emergency Relief Fund (HEERF) disbursements between 2020 and 2022, and federal grants from the U.S. Department of Health and Human Services through the Health Resources and Services Administration. Roseman is regionally accredited by the Northwest Commission on Colleges and Universities, a recognized accrediting body of the U.S. Department of Education, and its College of Dental Medicine holds accreditation from the Commission on Dental Accreditation.

9. Defendant Rachel Novak is the Dean of Student Affairs at Roseman's College of Dental Medicine. Novak is sued in her individual capacity under 42 U.S.C. § 1981. Novak personally participated in the discriminatory and retaliatory conduct, including: recharacterizing Ms. Qiu's protected complaints as "interpersonal relationships"; repeatedly directing Ms. Qiu to seek mental health treatment rather than addressing her documented concerns; conducting coercive meetings; sending daily coercive emails; and imposing indefinite suspension.

10. Defendant Clark Dana is the Dean of Academic Affairs at Roseman's College of Dental Medicine. Dana is sued in his individual capacity under 42 U.S.C. § 1981. Dana personally participated in the discriminatory and retaliatory conduct, including: presenting 27 unverifiable allegations while admitting they "may or may not be true, we don't know"; demanding Ms. Qiu sign the Action Plan under threat of expulsion; conducting coercive meetings; imposing indefinite suspension and discipline; retroactively falsifying Ms. Qiu's passing grades to "No Pass" without notice or justification; and issuing false representations regarding course requirements to delay her academic progress.

11. Defendant Laura Kadillak is a Patient Care Leader at Roseman's College of Dental Medicine. Kadillak is sued in her individual capacity under 42 U.S.C. § 1981. Kadillak personally participated in the discriminatory and retaliatory conduct, including: calling Ms. Qiu "sneaky" and accusing her of "manipulating" others; filing a fabricated Significant Infraction she knew to be

3

false; warning Ms. Qiu she would be under "more scrutiny" because faculty would be "worried that you might be trying to pull something"; sourcing false allegations for the Action Plan; and disclosing Ms. Qiu's confidential disciplinary information to the student body.

12.     Defendant Jonathan Fairbanks is the Assistant Dean at Roseman's College of Dental Medicine. Fairbanks is sued in his individual capacity under 42 U.S.C. § 1981. Fairbanks personally participated in the discriminatory and retaliatory conduct, including: issuing a fabricated infraction against Ms. Qiu in May 2025 based on a male student's unsubstantiated reports while ignoring Ms. Qiu's documented rebuttal and request for surveillance verification; participating in the January 19, 2026 meeting at which the 27-allegation Action Plan was presented; and threatening Ms. Qiu with additional infractions for clinical notes she could not complete because she had been suspended from campus, creating an impossible compliance trap.

## FACTUAL ALLEGATIONS

### I.     Ms. Qiu Is a Member of Protected Classes

13.     Ms. Qiu is a Chinese-American female—a member of protected classes under Title VI (race and national origin), Title IX (sex), and 42 U.S.C. § 1981 (race). This element is undisputed.

### II.     Ms. Qiu Was Qualified and Performing Satisfactorily

14.     Before January 2026, Ms. Qiu was an exemplary student. She achieved a 99th-percentile score on the Dental Admission Test (DAT), with a 26 Academic Average (AA) and 26 Total Science (TS). She passed the Integrated National Board Dental Examination on August 20, 2025. She maintained professionalism scores of 100 (Year 1) and 99 (Year 2). She had no prior Significant Infractions.

15.     Ms. Qiu had completed approximately two years of Roseman's accelerated three-year DMD program and most of her clinical requirements. She is scheduled to graduate in 2027.

16.     The sudden appearance of 27 severe accusations—including "unsafe patient care," "infection control violations," and "boundary violations"—after two years of satisfactory performance strains credulity. If Ms. Qiu had truly engaged in the egregious conduct alleged, the

4

University would have documented and addressed it contemporaneously. The absence of any earlier corrective action or warning for the alleged infractions supports the conclusion that the statements set forth in the Action Plan are pretextual, discriminatory fabrications.

### III.     Roseman Subjected Ms. Qiu to Severe Adverse Actions

17.     Roseman subjected Ms. Qiu to these materially adverse educational actions:

a.   On January 12, 2026, Roseman filed a Significant Infraction (SI) (#109) alleging Ms. Qiu performed "unauthorized treatment" on January 9, 2026—an allegation the supervising faculty's own evaluation contradicts;

b.   On January 13, 2026, Roseman suspended Ms. Qiu and barred her from campus, stating "We need you to stay off campus";

c.   On January 19, 2026, Roseman presented a 27-allegation Action Plan (ID 801) containing career-ending accusations of patient safety violations, ethical breaches, and professional misconduct;

d.   Roseman demanded Ms. Qiu sign the Action Plan as a condition of continued enrollment, with Dean Novak stating: "The consequence of not signing it is you're not a student here";

e.   When Ms. Qiu refused to confess to unverifiable allegations, Roseman imposed indefinite suspension, stating "You're just indefinitely suspended."

18.     Each of these actions independently constitutes a materially adverse educational action. Together, they represent an escalating campaign to force Ms. Qiu's departure from the program.

### IV.     Circumstances Giving Rise to an Inference of Discrimination

19.     The following facts establish that Ms. Qiu's race, national origin, and sex were motivating factors in Roseman's adverse actions:

5

### A. Temporal Proximity to Protected Complaints

20.     On December 17, 2025, Ms. Qiu submitted a written complaint to Dean Novak reporting that a male student's "repeated, aggressive attempts" to intrude on her clinical work constituted a threat to "patient's safety" and created a "hostile environment." Ms. Qiu's complaint arose in the context of a pattern she understood to be discriminatory: a white male classmate's unsubstantiated accusations against a Chinese-American female student were repeatedly credited by the administration, while her documented complaints about his aggressive conduct were dismissed or redirected to counseling. This complaint—reporting conduct she reasonably believed constituted race-based, national-origin-based, and sex-based discrimination creating a hostile educational environment—constitutes protected activity under Title VI, Title IX, and § 1981.

21.     Twenty-six days later (7 working days), on January 12, 2026, Roseman initiated formal discipline. This temporal proximity—less than four weeks—supports a strong inference of retaliatory and discriminatory motive.

### B. Disparate Treatment: The Action Plan Double Standard

22.     On information and belief, approximately 40 students were on action plans at any given time—yet no other student was barred from campus for declining to sign. During settlement negotiations, defense counsel did not deny that Ms. Qiu's treatment was unique.

23.     The contrast is stark: other students continued attending classes while on action plans; Ms. Qiu alone was told "You can't come off suspension until it's signed" and "Either you're going to sign it or you're going to go home and stay on suspension."

### C. Biased Remarks by Decision-Makers

24.     On January 12, 2026, Defendant Kadillak called Ms. Qiu "sneaky" and accused her of "manipulating" others. Kadillak warned that Ms. Qiu would face "more scrutiny" because faculty would be "worried that you might be trying to pull something."

25.     These characterizations—"sneaky," "manipulating," "trying to pull something"— invoke the "Dragon Lady" stereotype historically applied to Asian women as deceitful and

6

cunning. Kadillak applied these labels not in response to any actual misconduct (Ms. Qiu's treatment was faculty-authorized), but as a preemptive justification for heightened scrutiny.

26.     Administrators also dismissed Ms. Qiu's detailed documentation as evidence of "big feelings" requiring "professional help"—invoking the "hysterical woman" trope that has historically been used to discredit women who report mistreatment. Rather than investigate Ms. Qiu's concerns, Roseman pathologized the complainant.

### D. Procedural Irregularities

27.     Roseman deviated from its own procedures in Ms. Qiu's case. Roseman deliberately circumvented its own mandatory procedures by strategically mislabeling Ms. Qiu's discipline. Under the Student Handbook, USPB review is triggered when a student does not accept responsibility for a Significant Infraction and the allegation could result in a sanction imposing suspension, a delay in expected graduation, or dismissal. Roseman avoided USPB review by labeling its disciplinary instrument a "monitoring"—a purely semantic maneuver designed to bypass this process entirely.

28.     Administrators gave contradictory explanations: Dean Novak stated the January 9 SI was "separate" and pending committee review; Dean Dana simultaneously claimed the Action Plan was "the investigation" and resolution of that incident. These irreconcilable positions— delivered in the same meeting—evidence that the official story was incoherent and shifting.

### V.     Roseman's Stated Reasons Are Pretextual

29.     Roseman's proffered justification—that Ms. Qiu performed "unauthorized treatment"—is demonstrably false. The supervising faculty member's evaluation, submitted January 11, 2026, states in his own words: "Told student to go ahead and treat [tooth] #31." The treatment was authorized. The Significant Infraction was fabricated.

30.     When confronted with this exculpatory evidence, Roseman did not retract the SI or exonerate Ms. Qiu. Instead, Roseman abandoned the original allegation without issuing findings and pivoted to 27 new accusations. This pivot—from a specific, disprovable charge to a scattershot of unverifiable allegations—is itself evidence of pretext.

31.     The 27 allegations in the Action Plan are equally pretextual. Dean Dana admitted during the January 19, 2026 meeting that these allegations "may or may not be true," characterizing them as "he said, she said" and stating: "There were a lot of things that came up, that may or may not be true. We don't know."

32.     Despite this admission, the written Action Plan falsely claimed the allegations were "verified by independent corroboration by students, staff, hygienists, and faculty." The contradiction between what administrators told Ms. Qiu privately ("we can't prove this") and what they wrote officially ("independently verified") is damning evidence of pretext.

33.     The implausibility of the allegations further reveals pretext. The Action Plan accused Ms. Qiu of creating fake social media accounts, tracking faculty vehicles, wearing contaminated gloves, and other sweeping misconduct. If true, such egregious behavior would have prompted immediate intervention—not sudden discovery years into her enrollment, weeks after a protected complaint.

34.     The infection-control categories the Action Plan invokes—hand hygiene, personal protective equipment, glove integrity, and related patient-safety protocols—describe conduct that peer-reviewed studies of dental education document as occurring at substantial rates among dental students, residents, and faculty across U.S. and international programs. That Roseman seized on these categories to justify career-ending discipline against a Chinese-American female student—while taking no comparable action against any other student engaging in the same or worse conduct—reflects selective enforcement, not the enforcement of an actual institutional norm.

## VI.     Ms. Qiu Engaged in Protected Activity and Suffered Retaliation

35.     Ms. Qiu engaged in the following protected activities:

a.  August 21, 2025: Written complaint to Dean Novak documenting "repeated and targeted harassment" by a classmate, including threats to "put a tracker" on Ms. Qiu;

b.  December 11, 2025: Written complaint describing "malicious persecution" and a "hostile environment" in clinic;

c.  December 17, 2025: Written complaint reporting a male student's "repeated, aggressive attempts" to disrupt her patient care, describing conduct threatening "patient's safety" and creating a "hostile environment";

8

d.  January 14, 2026: Written memo to Dean Novak providing exculpatory evidence and requesting preservation of surveillance footage;

e.  January 19, 2026: Refusal to sign the Action Plan containing false allegations—an act of opposing discriminatory conduct;

f.  January 22, 2026: Formal appeal to Chancellor Wells protesting "non-verifiable allegations" and demanding reinstatement;

g.  February 2026: Counsel's communications explicitly raising claims of discrimination and retaliation on the basis of race, national origin, and sex in violation of Title VI, Title IX, and 42 U.S.C. § 1981;

h.  February 26, 2026: Written complaint to Clinic Deans protesting Defendant Kadillak's false Absence Alert logging 8 "absent" sessions during Plaintiff's campus-wide suspension—a factual and logistical impossibility, as Ms. Qiu had been removed from the clinic schedule on January 13, 2026 and was never placed on the clinic schedule up until March, and therefore could not have incurred absences from sessions she was never permitted to attend—requesting correction of the record, and opposing what Plaintiff identified as a retaliatory adverse record entry issued by Kadillak, while reiterating exculpatory evidence regarding the underlying Significant Infraction charge;

i.  March–April 2026: Counsel's continued advocacy, including challenges to grade falsification, fabricated absences, exclusion from student-conduct proceedings, and the false "block retake" demand.

36.     Each of these activities constitutes protected opposition to perceived discriminatory treatment or participation in complaint processes. Ms. Qiu's complaints about a "hostile environment," "malicious persecution," and threats to "patient's safety" were made in the context of a pattern she understood to be motivated by her race, national origin, and sex: a white male classmate's unsubstantiated accusations against a Chinese-American female student were repeatedly credited, while her documented complaints about his aggressive and intrusive conduct were dismissed, recharacterized as "interpersonal relationships," or redirected to mental health counseling. Ms. Qiu reasonably believed this differential treatment was based on her race, national origin, and sex. Ms. Qiu need not have used the words "discrimination" or "race" in her complaints to engage in protected activity; it is sufficient that she opposed conduct she reasonably and in good faith believed to be discriminatory.

37.     Roseman's response to each protected activity was escalating punishment: informal complaints yielded dismissive responses; formal complaints yielded fabricated discipline; exculpatory evidence yielded expanded allegations; refusal to confess yielded suspension. The pattern is unmistakable: Roseman retaliated against Ms. Qiu for speaking up.

## VII.   Detailed Chronology of Events

### A. Early Pattern: April–December 2025

38.     On April 14, 2025, Roseman administrators accused Ms. Qiu of writing her name next to a male student's name on a classroom game. Despite Ms. Qiu's denial, Dean Dana credited the male student's unsubstantiated claim that he "felt" it was her. This incident established a pattern: accusations against Ms. Qiu were credited without evidence; her denials were dismissed.

39.     On May 2, 2025, an infraction was issued against Ms. Qiu by Defendant Fairbanks following fabricated reports from a male student—allegations of lateness, failing to clean her operatory, and leaving early, that were entirely unsubstantiated. Ms. Qiu submitted a detailed rebuttal documenting the student's pattern of bullying, and explicitly requested the administration retrieve surveillance footage to verify the facts in her email to Defendant Fairbanks; however, this request was completely ignored, and Defendant Fairbanks provided no response at all. Consequently, the wrongful infraction remains on her record, further demonstrating Roseman's clear bias against her.

40.     On August 21, 2025, Ms. Qiu told Dean Novak in writing that she feared attempts "to create a record of misconduct on my part where none exists." Five months later, Roseman presented an Action Plan containing 27 unverifiable allegations. Ms. Qiu's documentation was not paranoia—it was prescience.

### B. December 2025: The Protected Complaints

41.     On December 11, 2025, Ms. Qiu emailed Dean Novak documenting that a male student had sabotaged her patient care on December 9 and 10. Ms. Qiu stated she wanted Novak "to be aware of the hostile environment I am currently navigating."

42.     On December 17, 2025, at 10:32 PM, Ms. Qiu submitted a second complaint reporting that the same male student—"Cedric"—had continued his "repeated, aggressive attempts" to disrupt her work, "pressuring" another student to leave "so he could forcefully seize control." Ms. Qiu reported feeling "completely unsafe in my own learning environment."

43.     On December 18, 2025, Dean Novak responded, copying multiple administrators. Through this email chain, Defendants Novak and Dana had direct, actual knowledge of Ms. Qiu's protected activity before any adverse action was initiated.

### C. January 9, 2026: The Authorized Treatment

44.     On January 9, 2026, Ms. Qiu attended a clinical session in Clinic 3A, Operatory 5. Her patient requested treatment of tooth #31, stating there was a "hole" and the patient "doesn't want to have it get worse."

45.     The supervising faculty member, Dr. Thomas Allen, authorized the treatment. His faculty evaluation, submitted January 11, 2026, documents in his own words: "Told student to go ahead and treat #31." *See Exhibit 7 (Dr. Allen Daily Evaluation Submission, January 11, 2026, including Additional Comments: "Told student to go ahead and treat #31").*

46.     When a hygienist questioned the treatment plan, Dr. Allen confirmed authorization. Under normal circumstances, this resolved inquiry would have ended there. But Defendant Kadillak—who was not supposed to be at school on Fridays and Fridays are her private practice day—arrived at school in casual clothing, sought out Dr. Garlick, and met with him behind closed doors for an extended period, causing delays to patient care as other staff had to interrupt the meeting to resume clinic operations. Kadillak and Dr. Garlick had no ongoing administrative duties overlap, as Garlick had transferred to a different quad entirely.

47.     On information and belief, the purpose of this unscheduled visit was to coordinate the filing of the Significant Infraction against Ms. Qiu. Later that same day, the fifth-floor administration emailed Ms. Qiu to schedule the January 13 meeting. Kadillak escalated the resolved question into a Significant Infraction. *See Exhibit 10 (Novak email, January 9, 2026, 3:55 PM, scheduling January 13 meeting before SI was filed).*

48.     Dr. Garlick's involvement in the events leading to the Significant Infraction was not coincidental. On information and belief, Dr. Garlick maintained a personal relationship with the male student (Cedric) whose unsubstantiated accusations formed the basis of the administration's retaliatory campaign against Ms. Qiu. Classmates observed Dr. Garlick and

11

associates of Cedric departing Dr. Garlick's personal vehicle together after going to lunch—conduct that is highly unusual at Roseman, where faculty-student socializing of this nature is not customary. This personal relationship between the faculty member coordinating with Kadillak and the student whose accusations Roseman credited over Ms. Qiu's documented complaints further evidences bias and coordinated action against Ms. Qiu.

### D. January 12, 2026: The Retaliatory Pivot Begins

49.     On January 12, 2026, at 9:29 AM—26 days (7 working days) after Ms. Qiu's protected complaint—Dean Novak emailed Ms. Qiu referencing the December 17 email. But Novak deliberately recharacterized Ms. Qiu's patient safety and hostile environment complaints as mere "interpersonal relationships on your clinic teams." This reframing was the first step in Roseman's retaliatory pivot. *See Exhibit 8 (Novak email, January 12, 2026, 9:29 AM, recharacterizing protected complaints as "interpersonal relationships on your clinic teams").*

50.     Later that day, Kadillak met with Ms. Qiu and called her "sneaky," accused her of "manipulating" others, and warned she would face "more scrutiny." That evening at 9:53 PM, Roseman filed the Significant Infraction. *See Exhibit 9 (Significant Infraction ID #109, January 12, 2026, 9:53 PM).*

### E. January 13–14, 2026: Suspension and Exculpatory Evidence

51.     On January 13, 2026, Defendants Novak and Dana suspended Ms. Qiu and barred her from the entire campus. During the meeting, administrators engaged in a wide-ranging interrogation, asking invasive questions about Ms. Qiu's family, parents' professions, and career motivations—questions irrelevant to the January 9 incident. Administrators also abruptly asked Ms. Qiu, "How do you feel like your relationships are with faculty?"—a question with no discernible connection to the Significant Infraction that had ostensibly prompted the meeting, and for which no procedural justification was offered. Administrators turned the interrogation outwards and coerced Ms. Qiu, under institutional duress, into naming other students involved in unrelated matters, stating: "you have to then be willing to give us the information." Roseman's administrators converted her, against her clearly and repeatedly stated wishes, into an involuntary informant—extracting intelligence about uninvolved peers not as a means of fact-finding, but as the price of her continued presence in the program. During the meeting, administrators pathologized Ms. Qiu's complaints, referencing her "big feelings" and urging her to "seek professional help." Dean Dana stated, completely unprompted, that they are "not professionally trained for therapy" to "manage all the difficult situations that you're dealing with."

52.     When Ms. Qiu asked during the January 13 meeting whether she was being formally investigated, Defendant Novak responded: "Absolutely. That's what this investigation is going to be about." Novak's statement confirmed that the interrogation itself was being treated as the investigation—with no prior notice of charges, no written statement of allegations, no opportunity to review evidence, and no process beyond the meeting at which Ms. Qiu was suspended and barred from campus. During the meeting, administrators repeatedly stated: "This is just based on Friday." and "We need to just investigate what happened on Friday.", repeatedly and explicitly confirming that the scope of the investigation would be limited to the January 9 clinical session.

53.     On January 14, 2026, Ms. Qiu submitted comprehensive documentation proving the January 9 treatment was authorized, including the faculty evaluation stating "Told student to

13

go ahead and treat #31." *See Exhibit 12 (Qiu Email to Roseman — Clarification re: Significant Infraction, January 14, 2026).* Ms. Qiu requested Roseman preserve surveillance footage from Clinic 3A.

54.     Dean Novak responded: "Thank you for this information. It will be very helpful." In the same email, Novak instructed: "Please use some of your free time today to make an appointment with TalkSpace." Rather than exonerate Ms. Qiu, Roseman continued directing her toward mental health services.

### F. January 19, 2026: The 27-Allegation Switch

55.     On January 15, 2026, Dean Novak represented in writing that the January 19 meeting would "focus on the investigation findings and your return to class/clinic." This representation was false.

56.     On January 19, 2026, instead of addressing the January 9 Significant Infraction or presenting investigation findings, administrators—including Defendants Novak, Dana, and Fairbanks—presented a pre-drafted 27-allegation Action Plan. The original "unauthorized treatment" charge was abandoned without findings; in its place stood accusations of creating fake social media accounts, tracking faculty vehicles, infection control violations, and other sweeping misconduct. *See Exhibit 11 (Student Action Plan ID 801, January 19, 2026, 27 allegations across 4 categories and 11 mandatory compliance requirements).*

57.     During the meeting, Dean Dana admitted the allegations "may or may not be true. We don't know," calling them "he said, she said" and stating: "There were a lot of things that came up, that may or may not be true. We don't know."

58.     When Ms. Qiu attempted to dispute the allegations, administrators stated: "You actually don't have an option of arguing whether something's on the action plan" and "There's no disagreements to be had."

59.     Administrators demanded Ms. Qiu's signature as a condition of continued enrollment:

    a. "Either you're going to sign it or you're going to go home and stay on suspension until you're ready to sign it."

    b. Dean Novak: "The consequence of not signing it is you're not a student here."

    c. Dean Novak: "You don't get to come back to school and not sign the action plan."

    d. Dean Novak: "You're just indefinitely suspended."

60. Ms. Qiu declined to sign. She could not ethically confess to allegations she knew to be false—particularly when the University's own administrator had just admitted they were unverifiable.

### G. January–February 2026: Appeals and Aftermath

61. On January 22, 2026, Ms. Qiu submitted a formal appeal to Chancellor Jeremy Wells, documenting Dean Dana's admission that the allegations were unverifiable and requesting unconditional reinstatement.

62. In early February 2026, Ms. Qiu's counsel became involved and explicitly raised claims that Defendants' conduct constituted discrimination and retaliation on the basis of race, national origin, and sex in violation of Title VI, Title IX, and 42 U.S.C. § 1981. In response, Roseman's attorney conceded that Ms. Qiu could return to classes without signing the Action Plan —implicitly acknowledging the coercive nature of the original process. However, Roseman refused to expunge the fabricated SI or Action Plan, seeking to preserve the damaging false charges in Ms. Qiu's file. This refusal to expunge occurred after Defendants had received explicit notice that their conduct was being challenged as discriminatory and retaliatory, and constitutes a continuing adverse action.

63. This partial reversal—removing the immediate suspension while leaving the baseless accusations intact—is itself evidence of bad faith. Roseman apparently recognized it could not defend the suspension, yet refused to acknowledge what the evidence proves: that the charges were fabricated in retaliation for Ms. Qiu's protected complaints.

### H. March–April 2026: Post-Notice Escalation

64. Rather than remedying the discrimination and retaliation, Defendants escalated their campaign against Ms. Qiu after her counsel's involvement. In early March 2026, Defendants

15

retroactively changed four of Ms. Qiu's previously passing grades to "No Pass" (NP) on her official transcript: DMD 5150 (Professionalism, D1), DMD 6150 (Professionalism, D2), DMD 6401 (Primary Care Clinic, June–December 2025), and DMD 6402 (Primary Care Clinic, January–March 2026). In DMD 6150, Ms. Qiu had earned a score of 99 out of 100, yet her transcript was changed to NP while all other students in the same cohort continued to show "Pass." Defendant Dana effected these grade changes without notice to Ms. Qiu and without valid academic justification. When Ms. Qiu's counsel raised the grade changes with Roseman's attorney, counsel for Roseman falsely stated that "None of Ms. Qiu's grades have been changed"—a statement directly contradicted by the official transcript.

65.     On March 6, 2026, Roseman's counsel informed Ms. Qiu's counsel that the University had "received a report from another student regarding interactions outside normal academic activities" and demanded that Ms. Qiu attend a meeting alone, without counsel present. Roseman refused to disclose the substance of the complaint in advance and refused to allow counsel to attend the meeting, characterizing it as "an administrative student conduct meeting, not a litigation proceeding." This demand that Ms. Qiu attend an ambush meeting without counsel replicated the coercive format of the January 13 and January 19 meetings and was designed to isolate and intimidate Ms. Qiu following her counsel's assertion of discrimination claims.

66.     On or about March 10, 2026, Defendants added Ms. Qiu to the clinic schedule after the workday had already begun, without any prior notice. Ms. Qiu had checked the schedule the previous evening and was not listed. On information and belief, this schedule manipulation was deliberately designed to create a documented absence that could be used to justify further disciplinary action.

67.     In addition to the schedule manipulation, Defendants submitted eight absence alerts for clinic sessions for which Ms. Qiu was never scheduled. These fabricated absences brought her total recorded absences to ten sessions—exceeding the eight-session limit that would trigger academic consequences under Roseman's policies. Ms. Qiu was not scheduled for these sessions,

16

received no notification of any scheduling, and had no opportunity to attend. The fabricated absence records were designed to create a pretextual basis for further adverse academic action.

68.    On March 12, 2026, Johnathan Mack sent a schoolwide email regarding a "recording" policy—the first such communication in the history of the program. No prior email on recording had ever been issued. The timing—three days after a meeting between Ms. Qiu and administration—strongly suggests this was an attempt to suppress Ms. Qiu's evidence-gathering efforts. Ms. Qiu had previously provided audio recordings of the January 19 meeting that contradicted Roseman's characterization of events.

69.    On information and belief, faculty member Steven Garlick was directed by the administration not to approve Ms. Qiu's outstanding clinical notes from the period of January 5–12, 2026, while simultaneously approving other students' notes without review. This selective refusal created an impossible compliance trap: Ms. Qiu was suspended from campus on January 13 and therefore could not access the Axium clinical system to complete her notes, yet was threatened with additional infractions by Defendant Fairbanks for having unapproved notes over 30 days old. The administration thus manufactured a violation from the very conditions it imposed.

70.    Despite claiming that Ms. Qiu had been "reintegrated" into the clinic, Defendants removed her from her clinical team's group chat, further isolating her from her peers and denying her access to routine clinical communications. On information and belief, Ms. Qiu's confidential disciplinary details were also disclosed to the student body by Defendant Kadillak and other Roseman employees, who were observed telling students that Ms. Qiu was "never coming back" and circulating details of the Action Plan—information that should have remained confidential under FERPA.

71.    On or about March 31, 2026, a clinical hygienist documented the following in Ms. Qiu's evaluation: "I did not like that he had to hold the suction the whole time and that no one would help you even though I asked 2 different students to do so." The hygienist had directly asked two different students on Ms. Qiu's team to assist, and both refused. This is not Ms. Qiu's characterization—it is a contemporaneous clinical evaluation by a Roseman employee

17

documenting that Ms. Qiu's peers are refusing basic clinical cooperation despite direct faculty-staff requests. The refusal to assist a classmate during active patient care—conduct that could compromise patient outcomes—is consistent with the "poisoning of the well" effect of Defendants' retaliatory campaign: having branded Ms. Qiu with 27 allegations of professional misconduct and circulated those allegations through the student body, Defendants created an environment in which Ms. Qiu's peers treat her as a pariah. *See Exhibit 1 (Hygienist Evaluation, Additional Comments, documenting peer refusal).*

72.     On or about March 19, 2026, Ms. Qiu learned that a highly specific rumor was circulating among students that her cousin had attended her admissions interview on her behalf—in other words, that Ms. Qiu had fraudulently gained admission to Roseman. This allegation is completely false. By April 2, 2026, Ms. Qiu confirmed that this rumor had spread not only throughout her own cohort but also to the Class of 2026B—a graduating class with whom Ms. Qiu has no personal connections. The breadth of dissemination across cohorts that do not interact with Ms. Qiu further indicates an institutional source rather than organic student gossip. Additionally, a separate rumor—that there were "11 pages of complaints" against Ms. Qiu and that she was "never coming back"—had been circulating since January 2026 and was confirmed to have also spread to the Class of 2026B. On information and belief, this rumor originated with Defendants Kadillak and Dr. Garlick, who were previously observed telling students that Ms. Qiu was "never coming back." A third rumor—that Ms. Qiu had been "stalking" faculty and creating fake social media accounts—was also circulating widely among the general student body by early April 2026. These details correspond to specific allegations contained in the confidential Action Plan, confirming that confidential disciplinary information was disclosed by institutional actors. The coordinated dissemination of these rumors served to isolate Ms. Qiu, destroy her reputation among peers and future colleagues, and construct a narrative designed to discredit her in advance of litigation.

73.     On March 24, 2026, Dale Hoopes sent Ms. Qiu an email stating that the immunology and infectious disease block "has been divided into two separate blocks" and offering

her the option of completing "the first assessment with the cohort on May 8, 2026 (DMD 5244.28)" and "the second assessment on September 4, 2026 (DMD 6244.28)"—implying she must retake the entire course across two semesters rather than sit for the single examination she had already been confirmed to take. Hoopes initiated a new email thread rather than replying to Ms. Qiu's March 2, 2026 email confirming the prior arrangement, on information and belief to create a misleading paper trail. *See Exhibit 2 (Hoopes email, March 24, 2026, offering two-block retake structure).*

74. On April 2, 2026, Defendant Dana personally intervened, emailing Ms. Qiu to state: "I am following up after the email you sent to Dale." Dana reiterated that the block "has been divided into two separate blocks" and pressed Ms. Qiu to "confirm you would like to choose the option (option 1) of taking two separate assessments as a makeup." Dana's representation that the block had been "divided" is contradicted by Roseman's own published curriculum. The official Class of 2028 block schedule—the very cohort Dana referenced—lists "DMD 5244.28 Basic Immunology and Infectious Diseases" as a single entry with a single assessment date of May 8, 2026. No second block, no second assessment, and no September date appears in the published schedule. If the block had truly been divided, the schedule would reflect two separate entries, with the names of the courses listed as I and II. On information and belief, Dana's representation that the course had been split into two separate blocks was false, and the demand that Ms. Qiu complete two assessments separated by a four-month gap was designed to delay her academic progress and create additional opportunities for manufactured failures. *See Exhibits 3–5 (Dana email, April 2, 2026, pressuring two-assessment structure; Roseman Curriculum Schedule showing single contiguous block; Class of 2028 Block Schedule showing single entry with May 8, 2026 assessment date and no September date).*

## VIII.   <u>Comparator Evidence and Pattern of Selective Enforcement</u>

75. Roseman's disparate treatment of Ms. Qiu is further evidenced by its treatment of comparator students. On information and belief, a non-minority male student in Ms. Qiu's program had a patient complaint documented in the chart notes, who came in for discomfort from the

restoration completed from the male student: "Patient was not happy with treatment from last provider, felt rushed and mistreated with completion on LL restoration. Pt expressed emotions toward treatment." No disciplinary action or reprimand was issued against this student. By contrast, Ms. Qiu received a Significant Infraction based on far less substantiated complaints.

76.     Similarly, other students were observed routinely using contaminated gloves to handle items from clean restorative kits and changing patient treatment plans without faculty authorization—the very conduct for which Ms. Qiu was cited in her Action Plan—yet no disciplinary action was taken against any of them. On or about March 31, 2026, a student on Ms. Qiu's own clinical team was observed picking up a contaminated suction component from the floor with gloved hands, placing it back into the suction stand without disinfecting it, and then using the same contaminated gloves to continue treating a patient's mouth. The same student was also observed touching their own hair with contaminated gloves and then reinserting their hands into a patient's oral cavity. No Significant Infraction, no action plan, and no discipline of any kind was imposed on this student. The conduct Roseman cited against Ms. Qiu under the label "infection control violations"—to the extent it occurred at all—falls within the range of protocol deviations that peer-reviewed observational studies document as common across dental-education environments, further underscoring that Roseman's selective invocation of these categories against Ms. Qiu is pretextual rather than normative.

77.     On information and belief, students on the clinical floor were observed on a regular basis eating food inside the clinic and interrupting active patient procedures to retrieve food from clinic cabinets mid-treatment. This conduct implicates the very "infection control violations" and "unsafe patient care" that Roseman placed at the center of Ms. Qiu's Action Plan. No disciplinary action was taken against any of them.

78.     On information and belief, non-minority male students in Ms. Qiu's program have repeatedly performed other procedures on patients who were overdue for a Periodic Oral Examination (POE)—a documented protocol deviation—without any disciplinary action, Significant Infraction, or action plan being imposed.

20

79.     On information and belief, a non-minority male student erupted in a sustained, aggressive outburst on the clinic floor—screaming at another person loudly enough that his voice carried across the entire clinic, through every operatory, and was heard by every patient present. This was not a tense exchange or a moment of frustration: it was a prolonged, uncontrolled display of aggression in a medical setting, directed at another person, in front of patients who had come seeking care. Ms. Qiu—who performed a faculty-authorized procedure quietly, competently, and without incident—was suspended, barred from campus, and handed a 27-allegation Action Plan. This male student faced no suspension and no action plan of any kind.

80.     The culture of uncurbed male student aggression extended to Roseman's own staff. On information and belief, a second male student unleashed a hostile, aggressive verbal tirade at a female staff member on the clinic floor, reducing her to tears in front of her colleagues and peers. This was a male student berating a subordinate staff member with enough force and hostility that she broke down and cried. The staff member — a professional who comes to work every day to support patient care — was left visibly distressed, in the workplace, in front of everyone. No disciplinary action of any kind was taken against this male student. No Significant Infraction. No suspension. No action plan. Nothing. The institution that deemed Ms. Qiu's faculty-authorized, competent clinical work a threat serious enough to warrant immediate removal from campus did not find it necessary to issue so much as a warning to a male student whose aggressive conduct reduced a staff member to tears.

81.     The pattern of unchecked male student misconduct extended to the mistreatment of female students during active patient care. On information and belief, a female student reported to Roseman that a male student had repeatedly taken over her clinical procedures—physically displacing her from her own patient—and had made openly demeaning remarks directed at her in front of the patient while she was in the middle of treatment. The remarks were sufficiently undermining that the patient lost confidence in the female student entirely and dismissed her from the operatory. The female student reported this conduct to Roseman. No Significant Infraction was

21

filed. No suspension was imposed. No action plan was issued. No disciplinary action of any kind was taken against the male student.

82. On information and belief, a male student in Ms. Qiu's program was observed manipulating a loaded anesthetic syringe—containing a full carpule of local anesthetic—with bare, unsanitized hands during a period of downtime, discharging and wasting the entire carpule without clinical justification, and the same syringe was thereafter used on a subsequent patient without sanitization or replacement, in violation of infection-control and patient-safety standards. No Significant Infraction was filed. No action plan was issued. No disciplinary action of any kind was taken against this male student.

83. Published observational research on dental-student infection-control compliance reports that female students are measurably more compliant with infection-control protocols than their male peers. The pattern Ms. Qiu documents at Roseman—male students engaging in repeated, uncorrected, and at times egregious infection-control and patient-safety deviations without consequence, while Ms. Qiu faced suspension and a 27-allegation Action Plan for faculty-authorized treatment—inverts the compliance gradient the published literature records, and is consistent with sex-based selective enforcement rather than evenhanded application of institutional standards.

84. In or about November 2025, a male student on Ms. Qiu's clinical team attempted to proceed with an unnecessary tooth extraction—a procedure that, if completed, would have caused irreversible harm to a patient who did not need it and had not consented to losing a permanent tooth. An unnecessary extraction is among the most serious patient safety violations that can occur in a dental school clinic: it is the irreversible removal of a patient's permanent tooth without clinical justification. The incident was reported to faculty. No Significant Infraction was filed. No action plan was issued. No disciplinary action of any kind was taken against this male student. Ms. Qiu—who competently performed a faculty-authorized procedure without incident— was suspended, barred from campus, and handed a 27-allegation Action Plan.

85.     On or about March 30, 2026, a second female student at Roseman independently approached Ms. Qiu and reported that she had been discriminated against by Defendant Fairbanks because of her sex, and that she had been treated differently than male students. This student described specific circumstances of differential treatment by Fairbanks. The fact that a second female student—independently and without solicitation—identified the same pattern of sex-based discrimination by the same administrator further evidences that Roseman's discriminatory treatment of Ms. Qiu is not isolated but reflects a systemic pattern within the College of Dental Medicine.

86.     On information and belief, faculty member Steven Garlick treated Ms. Qiu and at least one other female student differently from similarly-situated male classmates in the clinical setting. Dr. Garlick enforced clinic rules selectively by sex, permitting male students to engage in conduct for which female students were reprimanded. He also made remarks that diminished females' professional aspirations and their personal circumstances in ways he did not direct at male students with comparable academic records.

87.     On information and belief, another female student at Roseman has independently reported to Ms. Qiu that Dr. Garlick treated her less favorably than male classmates in clinical grading and evaluation. This corroboration from an additional female student—independent of the comparator evidence involving Defendant Fairbanks described above—further evidences a broader, institutional pattern of sex-based differential treatment within Roseman's College of Dental Medicine.

88.     On information and belief, in or about March 2026, a male student at Roseman took over a clinical patient previously assigned to Ms. Qiu, depriving Ms. Qiu of the clinical learning opportunity and the associated academic credit. On information and belief, no comparable reassignment of patients from male students to female students has occurred in similar circumstances. The reassignment of Ms. Qiu's patient to another male student—while Ms. Qiu remained under heightened scrutiny and while male comparators faced no similar disruption— further evidences the differential treatment Ms. Qiu experienced following the January 9 incident.

23

89.     On information and belief, the same male student was previously observed by other Roseman students mocking Ms. Qiu's suspension, indicating that information regarding Ms. Qiu's confidential disciplinary status had been disclosed within the student body. Under Roseman's Student Handbook and applicable federal law, student disciplinary and educational records are confidential and may not be disclosed to other students without the affected student's consent. See 20 U.S.C. § 1232g. On information and belief, Ms. Qiu did not consent to any such disclosure. The dissemination of Ms. Qiu's disciplinary status within the Roseman student community breached Roseman's contractual confidentiality obligations to Ms. Qiu and exposed her to ridicule, ostracism, and further reputational harm within the institution.

## IX.     Faculty Corroboration and Institutional Recognition of Wrongfulness

90.     On information and belief, a faculty member at Roseman expressed to a student that he was "very angry" about the treatment Ms. Qiu was receiving from other faculty and administrators, and encouraged her to pursue legal action because "it's very not right." During this exchange, the same faculty member also explicitly criticized the treatment Ms. Qiu was receiving from her clinical team. In describing Ms. Qiu's classmates, the faculty member characterized them as "tough," then corrected himself to "terrible," and ultimately described their conduct as "brutal to her." The faculty member further stated that Ms. Qiu had never bothered anyone and had done nothing to invite the treatment she was receiving. On or about April 1, 2026, the same faculty member approached Ms. Qiu in clinic, handed her a card with his personal phone number, and expressed his support. This unsolicited statement and gesture—volunteered by a Roseman faculty member—further corroborates that Ms. Qiu's treatment was recognized within the institution as unjust and aberrant.

## X.     Nevada Campus Transfer

91.     Roseman operates a second College of Dental Medicine campus in Henderson, Nevada. On information and belief, at least seven students from Ms. Qiu's cohort have transferred from the Utah campus to the Nevada campus during the period of events alleged herein. The Nevada campus offers the same D.M.D. curriculum, and on information and belief has capacity to

accommodate Ms. Qiu's transfer without disruption to her scheduled graduation. The cumulative effect of Defendants' retaliatory conduct—including the hostile actions of faculty and administrators at the Utah campus, the fabrication of disciplinary records, the exclusion from academic communications and clinical scheduling, and the ongoing pattern of escalating retaliation—has rendered the Utah campus environment untenable for Ms. Qiu. A transfer to the Nevada campus would allow Ms. Qiu to continue her dental education in an environment free from the individuals who have engaged in the discriminatory and retaliatory conduct alleged herein, while preserving Roseman's institutional interest in retaining an enrolled student.

## XI.   Medical Documentation of Harm

92.    On March 31, 2026, Sayamuny Rattanatay, PA, of Medallus Medical issued a formal medical letter regarding Ms. Qiu, following a clinical assessment on March 1, 2026. The letter states: "This condition constitutes a disability that substantially limits her major life activities. After clinic assessments and health history, the environment is a direct trigger for exacerbations of her medical symptoms. To prevent further deterioration and facilitate the necessary recovery process, it is medically necessary that I recommended that Yuyang distance herself from the school environment." The medical professional's determination that Ms. Qiu's school environment—the environment created by Defendants' discriminatory and retaliatory conduct—is the direct trigger for her medical symptoms, and that her condition constitutes a qualifying disability, further underscores the severity of the harm Defendants have inflicted and the urgency of injunctive relief, including a campus transfer. *See Exhibit 6 (Medical Letter, Sayamuny Rattanatay, PA, Medallus Medical, March 31, 2026).*

## XII.   Damages

93.    As a direct and proximate result of Defendants' conduct, Ms. Qiu has suffered and continues to suffer:

   a. Loss of educational opportunity, including missed clinical rotations, coursework, and examinations;
   b. Imminent threat to her ability to graduate and obtain licensure as a dentist;

25

c. Mandatory disclosure obligations on licensure applications due to the SI and Action Plan;

d. Loss of tuition, fees, and cost of living (Cost of Attendance) exceeding $304,000, according to Roseman's published Cost of Attendance figures;

e. Loss of future earning capacity as a licensed dentist. The U.S. Bureau of Labor Statistics reports a mean annual wage of $196,100 for general dentists and $246,530 for specialist dentists (Occupational Employment and Wage Statistics, May 2024, SOC 29-1021 and 29-1029), and American Dental Association Health Policy Institute data reflect an average dental career length exceeding forty years—yielding present and future lost earnings reasonably estimated in excess of several million dollars over Ms. Qiu's expected career, subject to expert quantification at trial;

f. Severe emotional distress, anxiety, and reputational harm;

g. Physical and medical harm, including a documented medical condition constituting a disability that substantially limits major life activities and is directly triggered by the school environment Defendants created;

h. Costs and attorneys' fees incurred in challenging Defendants' unlawful conduct.

## CLAIMS FOR RELIEF

### COUNT I
### TITLE VI OF THE CIVIL RIGHTS ACT OF 1964
### Race and National Origin Discrimination
(Against Defendant Roseman University)

94. Plaintiff realleges and incorporates by reference paragraphs 1–81.

95. Defendant Roseman University receives federal financial assistance and is subject to Title VI, 42 U.S.C. § 2000d.

96. Ms. Qiu establishes a prima facie case of intentional discrimination: (1) she is a member of protected classes (Asian, Chinese national origin); (2) she was qualified and performing satisfactorily; (3) she suffered materially adverse educational actions including the SI, Action Plan, and suspension; and (4) the circumstances—including temporal proximity to her protected complaints, disparate treatment compared to other students, biased remarks by decision-makers, procedural irregularities, and the pretextual nature of the stated reasons—give rise to an inference of discrimination.

97. Roseman's proffered reasons for its actions—alleged "unauthorized treatment" and the 27 allegations in the Action Plan—are pretextual. The faculty evaluation proves the treatment

26

was authorized. Roseman's own Dean admitted the 27 allegations "may or may not be true. We don't know." These stated reasons are unworthy of credence and mask discriminatory intent.

98.    Roseman's discrimination caused Ms. Qiu to suffer damages.

**COUNT II**
**TITLE VI OF THE CIVIL RIGHTS ACT OF 1964**
**Retaliation**
(Against Defendant Roseman University)

99.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

100.    Ms. Qiu engaged in protected activity when she opposed conduct she reasonably and in good faith believed constituted discrimination on the basis of race and national origin, including her complaints about a hostile educational environment in which a white male classmate's unsubstantiated accusations against a Chinese-American female student were credited while her documented complaints were dismissed. Ms. Qiu's protected activity includes her May 2025 rebuttal of fabricated attendance and performance reports; her August 21, 2025, December 11, 2025, and December 17, 2025 complaints; her January 14, 2026 submission of exculpatory evidence; her January 19, 2026 refusal to sign an Action Plan she believed was the product of discriminatory and retaliatory targeting; her January 22, 2026 formal appeal; her counsel's February 2026 communications explicitly raising claims of race, national origin, and sex discrimination and retaliation; and her counsel's continued March–April 2026 advocacy, including demands for reinstatement, objections to exclusion from student-conduct proceedings, and challenges to fabricated attendance records and grade falsification.

101.    Roseman subjected Ms. Qiu to materially adverse actions, including the SI, Action Plan, and indefinite suspension, as well as post-suspension retaliatory acts including: falsification of grades in DMD 5150, 6150, 6401, and 6402; conversion of a 99% score in DMD 6150 to "NP"; exclusion of counsel from a March 6, 2026 student-conduct meeting; manipulation of Ms. Qiu's clinic schedule by adding appointments after her shift had already begun; fabrication of absence alerts for eight clinic sessions that were never scheduled; suppression of her right to record meetings; imposition of an impossible compliance trap requiring supervisor note-approval from a

27

supervisor who had been instructed not to approve her notes; removal from the D3 cohort Teams group chat accompanied by FERPA-violating disclosures of her disciplinary status; fabrication of a rumor that Ms. Qiu's cousin had been involved in her admissions interview; issuance of a retake-blocking email by Dale Hoopes despite prior confirmation of her eligibility; and Defendant Dana's April 2, 2026 false representation that a single examination had been "divided into two separate blocks" requiring assessments four months apart, contradicted by Roseman's own published curriculum schedule.

102.    There is a causal connection between Ms. Qiu's protected activity and Roseman's adverse actions, as demonstrated by: (a) the 26-day (7 working days) temporal proximity between her December 17 complaint and the January 12 SI; (b) Dean Novak's January 12 email explicitly referencing Ms. Qiu's December 17 complaint before recharacterizing it; (c) the pretextual nature of the stated reasons; and (d) the escalating pattern of punishment following each protected act.

103.    Roseman's retaliation caused Ms. Qiu to suffer damages.

## COUNT III
### TITLE IX OF THE EDUCATION AMENDMENTS OF 1972
#### Sex Discrimination
(Against Defendant Roseman University)

104.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

105.    Defendant Roseman University receives federal financial assistance and is subject to Title IX, 20 U.S.C. § 1681.

106.    Roseman intentionally discriminated against Ms. Qiu on the basis of her sex (female) by: crediting male students' unsubstantiated accusations while dismissing her documented complaints; applying the "sneaky" and "manipulating" stereotypes that have particular force against Asian women; characterizing her detailed documentation as evidence of "big feelings" requiring "professional help"—invoking the historical trope to discredit a woman who reported mistreatment; treating her far harsher than similarly situated students; and maintaining a pattern of selective enforcement that protected male students who engaged in identical or more egregious conduct while punishing female students who reported mistreatment.

107.    Roseman's discrimination caused Ms. Qiu to suffer damages.

## COUNT IV
## TITLE IX OF THE EDUCATION AMENDMENTS OF 1972
### Retaliation
(Against Defendant Roseman University)

108.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

109.    Ms. Qiu engaged in protected activity when she reported conduct creating a hostile educational environment.

110.    Roseman subjected Ms. Qiu to materially adverse actions in retaliation.

111.    There is a causal connection between Ms. Qiu's protected activity and Roseman's adverse actions.

112.    Roseman's retaliation caused Ms. Qiu to suffer damages.

## COUNT V
## 42 U.S.C. § 1981
### Retaliation
(Against All Defendants)

113.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

114.    Ms. Qiu had a contractual relationship with Roseman governing her education. This contract is protected by 42 U.S.C. § 1981, which guarantees all persons the same right to make and enforce contracts as is enjoyed by white citizens. The Supreme Court has held that § 1981 encompasses retaliation claims. CBOCS West, Inc. v. Humphries, 553 U.S. 442, 452–57 (2008).

115.    Ms. Qiu engaged in protected activity when she opposed conduct she reasonably and in good faith believed constituted race discrimination, including her complaints about a hostile educational environment in which a white male classmate's unsubstantiated accusations against a Chinese-American student were credited while her documented complaints were dismissed; her refusal to sign an Action Plan she believed was the product of discriminatory and retaliatory targeting; her January 22, 2026 formal appeal; her counsel's February 2026 communications explicitly raising claims of race discrimination and retaliation under § 1981; and her counsel's continued March–April 2026 advocacy, including demands for reinstatement, objections to

29

exclusion from student-conduct proceedings, and challenges to fabricated attendance records and grade falsification.

116.    Defendants retaliated against Ms. Qiu because of her protected activity by filing a fabricated Significant Infraction, suspending her from campus, presenting a 27-allegation Action Plan containing admittedly unverifiable accusations, demanding she sign the Action Plan under threat of expulsion, and imposing indefinite suspension when she refused. Following Ms. Qiu's counsel's involvement, Defendants intensified their retaliation by falsifying her grades, fabricating absence alerts for sessions never scheduled, manipulating her clinic schedule, excluding counsel from student-conduct proceedings, suppressing her right to record meetings, imposing an impossible compliance trap through note-approval blockades, removing her from the D3 cohort Teams group chat, fabricating a rumor about her admissions interview, issuing a retake-blocking email despite prior confirmation of eligibility, and Defendant Dana's April 2, 2026 false representation that a single examination had been "divided into two separate blocks" requiring assessments four months apart, contradicted by Roseman's own published curriculum schedule. Each of these actions would deter a reasonable person from making or supporting a charge of discrimination.

117.    There is a causal connection between Ms. Qiu's protected activity and Defendants' adverse actions, as demonstrated by: (a) the 26-day (7 working days) temporal proximity between her December 17, 2025 complaint and the January 12, 2026 Significant Infraction; (b) Dean Novak's January 12 email explicitly referencing Ms. Qiu's December 17 complaint before recharacterizing it; (c) the pretextual nature of the stated reasons for discipline; and (d) the escalating pattern of punishment following each protected act.

118.    Defendants Novak, Dana, Kadillak, and Fairbanks personally participated in the retaliatory conduct and are liable in their individual capacities under § 1981.

119.    Defendants' conduct was willful, wanton, malicious, and in reckless disregard of Ms. Qiu's rights, warranting punitive damages.

120.    Defendants' retaliation caused Ms. Qiu to suffer damages.

## COUNT VI
### 42 U.S.C. § 1981
### Race Discrimination in Contract
(Against All Defendants)

121. Plaintiff realleges and incorporates by reference all preceding paragraphs.

122. Ms. Qiu had a contractual relationship with Roseman governing her education. This contract is protected by 42 U.S.C. § 1981, which guarantees all persons the same right to make and enforce contracts as is enjoyed by white citizens.

123. Defendants intentionally discriminated against Ms. Qiu on the basis of her race in the making, performance, modification, and termination of her educational contract.

124. Defendants Novak, Dana, Kadillak, and Fairbanks personally participated in the discriminatory conduct and are liable in their individual capacities.

125. Defendants' conduct was willful, wanton, malicious, and in reckless disregard of Ms. Qiu's rights, warranting punitive damages.

126. Defendants' discrimination caused Ms. Qiu to suffer damages.

31

## COUNT VII
## BREACH OF CONTRACT
(Against Defendant Roseman University)

127. Plaintiff realleges and incorporates by reference all preceding paragraphs.

128. Ms. Qiu and Roseman entered into an implied contract through Ms. Qiu's enrollment and Roseman's Student Handbook, which establishes procedures and standards governing student discipline.

129. Roseman breached this contract by: failing to follow its handbook procedures for Significant Infractions; bypassing USPB review by labeling discipline as "monitoring"; denying Ms. Qiu any opportunity to contest the 27 allegations; misrepresenting the January 19 meeting agenda; demanding Ms. Qiu sign admittedly unverifiable allegations as a condition of enrollment; abandoning the original SI without findings while substituting an unrelated Action Plan; misrepresenting course requirements to delay Ms. Qiu's academic progress; and failing to maintain the confidentiality of Ms. Qiu's disciplinary and educational records by permitting information concerning Ms. Qiu's disciplinary status to be disclosed within the Roseman student body, in violation of the Student Handbook and 20 U.S.C. § 1232g.

130. Roseman's breach caused Ms. Qiu to suffer damages.

## COUNT VIII
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
(Against Defendant Roseman University)

131. Plaintiff realleges and incorporates by reference all preceding paragraphs.

132. The contract between Ms. Qiu and Roseman contains an implied covenant of good faith and fair dealing.

133. Roseman breached this covenant by: proceeding with a disciplinary SI charge while in possession of direct evidence of Ms. Qiu's innocence; pivoting from the original allegation to 27 new allegations upon receiving exculpatory evidence; presenting allegations as "verified by independent corroboration" when its own Dean admitted they "may or may not be true";

demanding Ms. Qiu confess to false allegations under threat of expulsion; and falsely representing that a single examination had been divided into two separate assessments to delay her progress.

134. Roseman's breach caused Ms. Qiu to suffer damages.

## **PRAYER FOR RELIEF**

A. Enter a declaratory judgment that Defendants violated Title VI, Title IX, and 42 U.S.C. § 1981 (including retaliation prohibitions thereunder), and breached their contractual obligations to Ms. Qiu;

B. Enter preliminary and permanent injunctive relief ordering Roseman to: (1) immediately reinstate Ms. Qiu to full academic and clinical participation; (2) stay any dismissal, involuntary withdrawal, or adverse academic action; (3) expunge the Significant Infraction and Action Plan from her record; (4) transfer Ms. Qiu to the Nevada campus if she so elects; and (5) provide Ms. Qiu with the procedural protections required by Roseman's Student Handbook;

C. Award compensatory damages as follows: (1) on all claims, economic damages including lost tuition, lost educational opportunity, lost earning capacity, and reputational harm; and (2) on the 42 U.S.C. § 1981 claims (Counts V and VI), additional damages for emotional distress, anxiety, and physical and medical harm;

D. Award punitive damages against Defendants Novak, Dana, Kadillak, and Fairbanks for their willful, malicious, and reckless conduct;

E. Award costs of suit, including reasonable attorneys' fees under 42 U.S.C. § 1988;

F. Award pre-judgment and post-judgment interest; and

G. Grant such other and further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

33

DATED this 16th day of April, 2026.

Respectfully submitted,

SPENCERWILLSON, PLLC

*/s/ Sarah Elizabeth Spencer*
Sarah Elizabeth Spencer
*Attorney for Plaintiff Yuyang Qiu*

**Plaintiff's address:**

Contact through counsel.

34

**EXHIBIT APPENDIX**

**EXHIBIT 1**

**Hygienist Evaluation — Additional Comments Documenting Peer Refusal**

Additional Comments

SRP UL/LL - cleaning was done well today. I did not like that he had to hold the suction the whole time and that no one would help you even though I asked 2 different students to do so. Continue to work on verbal OHI with your patient. I have a list of points to go over with your patient if you would like.

10894 S. River Front Parkway | South Jordan, UT 84095 | 801-302-2600
roseman.edu

35

**EXHIBIT 2**

**Hoopes Email — DMD 6244 Makeup Assessment (March 24, 2026)**



36

## **EXHIBIT 3**

## **Dana Email — Block Retake Pressure (April 2, 2026)**



**Clark Dana**                                                                                    11:34 AM (35 minutes ago)    ☆    ☺    ↩    ⋮
to Dale, me ▾

Ellie,

I am following up after the email you sent to Dale.

You indicate you would like to take the makeup assessment with the 2028 cohort.  I just want to make sure you understand that this will only be PART of the assessment you need to complete.  As has been communicated, *for the 2028 cohort the Immunology and Infectious Disease block 6244.27 has been divided into two separate blocks. If you would like to take the blocks again with the next cohort you would complete the first assessment with the cohort on May 8, 2026 (DMD 5244.28 Immunology and Infectious Disease 1)* <u>**and the second assessment on September 4, 2026 (DMD 6244.28 Immunology and Infectious Disease 2).**</u>

If you elect this option, each exam will be administered under the same conditions as the cohort scheduled to test on those dates.

This was the first of the options we provided for you to make up this assessment.  Again, I just want to make sure this was clear and this is the option you prefer.

As a reminder, the second option we provided was as follows:

*Or, you may elect to take the makeup assessment on your own and complete an Additional Competency Opportunity ("ACO") in lieu of team points.*

*ACOs are written and submitted immediately following the reassessment. Students may write an ACO for no less than 3 questions and no more than 10 questions. ACOs will be evaluated by the Office of Oral Healthcare Education or their designee(s). The ACO evaluator is authorized to award full credit for each item response using an approved rubric.*

<u>**Please confirm you would like to choose the option (option 1) of taking two separate assessments as a makeup.**</u>

**EXHIBIT 4**

**Roseman Curriculum Schedule — Weeks 43–47, Single Contiguous Block**



**EXHIBIT 5**

**Class of 2028 Block Schedule — DMD 5244, Single Entry**

| Class of 2028 | | |
|---|---|---|
| Block | Assessment Date | Reassessment Date |
| DMD 5400.28 INTRODUCTION TO INTEGRATED CLINICAL SCIENCES | 6/26/2025 | 6/26/2025 |
| DMD 5240.28 GENERAL ANATOMY | 7/25/2025 | 7/28/2025 |
| DMD 5301.28 DENTAL TERMINOLOGY AND ANATOMY | 7/31/2025 | 8/4/2025 |
| DMD 5251.28 CELLULAR METABOLISM AND ADAPTATION | 8/22/2025 | 8/25/2025 |
| DMD 5221.28 CLINICAL HEAD AND NECK 1 | 9/19/2025 | 9/22/2025 |
| DMD 5261.28 ORAL DEVELOPMENT AND HISTOLOGY | 10/10/2025 | 10/13/2025 |
| DMD 5321.28 RESTORATIVE DENTISTRY 1 | 10/17/2025 | 10/20/2025 |
| DMD 5200.28 PHARMACOLOGY BASICS | 11/7/2025 | 11/10/2025 |
| DMD 5350.28 INTRODUCTION TO PERIODONTICS | 11/21/2025 | 11/24/2025 |
| DMD 5110.28 BEHAVIORAL SCIENCES | 12/12/2025 | 12/15/2025 |
| DMD 5120.28 DENTAL PUBLIC HEALTH | 12/17/2025 | 12/19/2025 |
| DMD 5222.28 HEAD AND NECK ANATOMY | 1/16/2026 | 1/19/2026 |
| DMD 5380.28 ENDODONTIC DIAGNOSIS & TREATMENT | 2/6/2026 | 2/9/2026 |
| DMD 5210.28 PATHOLOGY | 2/20/2026 | 2/23/2026 |
| DMD 5322.28 RESTORATIVE DENTISTRY 2 | 3/27/2026 | 3/30/2026 |
| DMD 5360.28 ORAL AND MAXILLOFACIAL SURGERY | 4/2/2026 | 4/6/2026 |
| DMD 5370.28 PEDIATRIC DENTISTRY | 4/17/2026 | 4/20/2026 |
| DMD 5244.28 BASIC IMMUNOLOGY AND INFECTIOUS DISEASES | 5/8/2026 | 5/11/2026 |
| DMD 5375.28 ORTHODONTICS - GROWTH & DEVELOPMENT | 5/29/2026 | 6/2/2026 |
| DMD 5330.28 REPLACEMENT OF MISSING TEETH | 6/5/2026 | 6/8/2026 |

**EXHIBIT 6**

**Medical Letter — Rattanatay, Medallus Medical (March 31, 2026)**

*[PDF document — filed as separate attachment]*

File: EX_2026-03-31_Medical_Letter_Rattanatay_Disability_Accommodation.pdf

## EXHIBIT 7

### Dr. Allen Daily Evaluation Submission (January 11, 2026) — "Told student to go ahead and treat #31"



**Additional Comments**

Patient was scheduled for scaling. Student represented that patient was in pain lower right #31 had a hole in the tooth he wanted it taken care instead of scaling due to pain. Told student to go ahead and treat # 31 today because of his complaint of pain. Student administered local anesthetic and prepped tooth. Upon checking preparation patient was asked about pain in tooth and he stated that tooth didn't bother him, no pain he just gets food caught in hole. Had student fill tooth, restoration was clinically acceptable. After finish check student requested to do fillings #18 and #19. Patient and student were told scaling must be completed first before any more restorations are done as per school policy. Patient agreed and scheduled scaling appointment. Student informed in future scaling must be completed first before any other treatment.

**EXHIBIT 8**

**Novak Email (January 12, 2026, 9:29 AM) — Recharacterizing Complaints as "Interpersonal Relationships"**

---

**Rachel Novak** <rnovak@roseman.edu>                                              Mon, Jan 12, 2026 at 9:29 AM
To: Yuyang Qiu <yqiu993@student.roseman.edu>

Hello Ellie,

This is the most recent report you sent to me. I would like to discuss this report as well as all of the others you have sent to me. As well as your overall interpersonal relationships on your clinic teams.

[Quoted text hidden]

---

## EXHIBIT 9

## Significant Infraction ID #109 — Email Notification (January 12, 2026, 9:53 PM)

1/25/26, 3:22 AM                                    Roseman University of Health Sciences Mail - Professionalism (Significant Infraction) ID# 109

ROSEMAN UNIVERSITY
OF HEALTH SCIENCES

                                                    Yuyang Qiu <yqiu993@student.roseman.edu>

### Professionalism (Significant Infraction) ID# 109
1 message

**Institutional Assessment** <iassessment@roseman.edu>                  Mon, Jan 12, 2026 at 9:53 PM
To: Yuyang Qiu <yqiu993@student.roseman.edu>

Yuyang Qiu (yqiu993@student.roseman.edu),

This notification is to inform you that a significant infraction for professionalism has been submitted on your behalf to the student progress committee. The student progress committee will be in-touch to provide further information and details. If you have any questions or concerns, please discuss them with your PCL.

Thank you,

*This is an automated message from the Roseman CODM Institutional Outcomes account.

CONFIDENTIALITY: This e-mail (including any attachments) may contain confidential, proprietary and privileged information, and unauthorized disclosure or use is prohibited. If you received this e-mail in error, please notify the sender and delete this e-mail from your system

📄 **winmail.dat**
   11K

https://mail.google.com/mail/u/1/?ik=93f0de731b&view=pt&search=all&permthid=thread-f:1854175993041418991&simpl=msg-f:1854175993041418991         1/1

43

## EXHIBIT 10

## Novak Email Scheduling January 13 Meeting (January 9, 2026, 3:55 PM) — Before SI Was Filed

1/16/26, 10:55 PM                    Roseman University of Health Sciences Mail - Ellie - Meeting at noon on Tuesday

 **ROSEMAN UNIVERSITY OF HEALTH SCIENCES**

**Yuyang Qiu <yqiu993@student.roseman.edu>**

### Ellie - Meeting at noon on Tuesday
3 messages

**Rachel Novak** <rnovak@roseman.edu>                    Fri, Jan 9, 2026 at 3:55 PM
To: Yuyang Qiu <yqiu993@student.roseman.edu>
Cc: Clark Dana <cdana@roseman.edu>

Hello Ellie,

Dr. Dana and I would like to meet with you on Tuesday (1/13) at noon in conference room 520. We would like to talk with you about a few topics, including the email you sent me right before break, regarding some of your interpersonal relationships in clinic.

Will that time work for you?

I hope you had a great break!

Dr. Novak

**Rachel Tomco Novak, PhD, MS**

Associate Dean, Enrollment and Student Success

Associate Professor, Biomedical Sciences

Roseman University of Health Sciences

College of Dental Medicine

10894 S. River Front Parkway, South Jordan, UT 84095

Office: 801-878-1296, D-528

rnovak@roseman.edu

*Transforming* Education. *Reimagining* Healthcare.

*Embracing* Discovery. *Committed* to Community.

www.roseman.edu

https://mail.google.com/mail/u/1/?ik=93f0de731b&view=pt&search=all&permthid=thread-f:1853881693139787416&simpl=msg-f:1853881693139787416&simpl=…    1/2

## EXHIBIT 11a

## Student Action Plan ID 801 (January 19, 2026) — Page 1 of 3

# ROSEMAN UNIVERSITY
### OF HEALTH SCIENCES

### Student Action Plan

Student Name: Ellie (Yuyang) Qui
Action Plan ID: 801
Meeting Date: Monday January 19, 2026
Faculty Present: Dr. Novak, Dr. Dana. Dr. Fairbanks
Block: DMD 6402 Primary Care Clinic
Block Grade: NP

Dear Ellie,

You have been placed on a period of monitoring. The reasons for this period of monitoring includes:

| Action Plan Type |
| --- |
| Clinical Monitoring |

| Areas of Clinical Monitoring |
| --- |
| ["Ethics and Professionalism","Clinical Sciences (Treatment)"] |

| Reasons for Monitoring |
| --- |

Allegations indicate the student initiated clinical care without faculty permission on Friday January 9, 2026. However, as the investigation occurred there were other allegations made as described below.

Dr. Dana and Dr. Novak discussed the initial allegation with Ellie on Tuesday January 13, 2026. After denying the incident Ellie shared additional information regarding conflicts she has had in the clinic with certain classmates. We indicated we would investigate these issues as well as the incident on Friday January 9, 2026.

In doing so we found allegations of a persistent and escalating pattern of misconduct which was verified by independent corroboration by students, staff, hygienists, and faculty. These allegations include:

1. **Patient Safety Violations and Ethical Breaches**

   There is a consistent and concerning pattern of unsafe and unethical patient care behaviors, including:
   - Beginning treatment or anesthetizing patients without faculty authorization
   - Proceeding without informed consent or without appropriate translation services
   - Ignoring or incompletely obtaining medical histories while documenting them as completed
   - Proceeding with treatment despite significant medical contraindications
   - Misrepresenting patient symptoms (e.g., pain or sensitivity) to obtain approval for procedures
   - Performing procedures with excessive force, resulting in patient pain and distress
   - Patients explicitly requesting not to be treated by her again, including refusal of her presence as a secondary

2. **Infection Control and Clinical Protocol Violations**

   Despite repeated instruction and correction, the student demonstrates ongoing disregard for infection control and clinic protocols:
   - Wearing contaminated gloves between operatories and touching clean equipment
   - Mixing contaminated and clean instruments
   - Reusing contaminated setups
   - Improper handling and disposal of bloody instruments
   - Removing chairs, equipment, and supplies from other clinics despite explicit directives not to do so
   - Appearance in clinic during scheduled lecture time despite explicit prohibition
   - Running in clinic, stopping only when observed
   - Taking UCC patients into closed or unassigned operatories
   - Discussing private patient information in public
   - Taking photographs of students and patients without consent

10894 S. River Front Parkway | South Jordan, UT 84095 | 801-302-2600
roseman.edu

45

## EXHIBIT 11b

## Student Action Plan ID 801 (January 19, 2026) — Page 2 of 3



ROSEMAN UNIVERSITY
OF HEALTH SCIENCES

**3. Teamwork**

The student consistently demonstrates behaviors that disrupt clinic operations and team cohesion:

- Avoiding assigned responsibilities and leaving during procedures
- Altering documentation to list herself as a secondary provider when she functioned as the primary, avoiding accountability
- Refusing to function as a cooperative team member
- Selectively refusing to work with certain classmates
- Avoiding responsibility for complications arising from her own treatment (e.g., staying in the bathroom for extended periods when asked to assist)
- Demanding classmates share procedure numbers

**4. Boundary Violations**

There is a concerning pattern of boundary violations affecting students, faculty, and patients:
- Secretly recording or attempting to record private conversations
- Eavesdropping on conversations by positioning herself between operatories or near offices
- Tracking faculty schedules, vehicles, and arrival times
- Creating and using fake social media accounts to impersonate classmates

**Action Plan**

It is our intent to give you every opportunity to succeed, and we are hopeful that this Action Plan will facilitate your rapid progress and development towards independence at the same level as your D2 classmates.

This Action Plan outlines required behaviors and expectations the student must follow in all academic, clinical, and assessment settings. Compliance is mandatory. Required Actions and Expectations:

1. Start Checks
    o The student must not begin any patient care or clinical procedure without obtaining the required faculty start check.
    o This expectation applies to all patients and all clinical sessions without exception.
2. Treatment Plan Adherence
    o The student must not change or alter the sequence of an approved treatment plan without explicit faculty approval.
    o Any proposed changes must be discussed with and approved by faculty prior to implementation.
3. Timely Completion of Consults
    o The student must complete all required consults in a timely manner, consistent with clinic expectations.
    o Consults may not be delayed or postponed without faculty awareness and approval.
4. HIPAA Compliance
    o The student must observe HIPAA guidelines at all times.
    o Specifically, the student must not discuss patient information in public areas or in the presence of unauthorized individuals.
5. Clinic Attendance and Accountability
    o The student must remain in clinic for the entirety of assigned clinic sessions unless formally dismissed by faculty.
    o The student must notify faculty immediately if leaving an assigned area is necessary for any reason.
    o The student must attend scheduled clinic sessions only (not during scheduled class sessions)
    o The student must use her assigned operatory during clinic sessions unless directed otherwise by faculty.

10894 S. River Front Parkway | South Jordan, UT 84095 | 801-302-2600
roseman.edu

46

## EXHIBIT 11c

## Student Action Plan ID 801 (January 19, 2026) — Page 3 of 3

## ROSEMAN UNIVERSITY
### OF HEALTH SCIENCES

6. OSHA and Infection Control Compliance
   - The student must strictly adhere to OSHA and infection control guidelines at all times.
   - This includes proper glove use and avoidance of contact with equipment or surfaces using contaminated gloves.
7. FERPA Compliance
   - The student must not request, discuss, or solicit classmates' individual procedure numbers or academic performance information.
   - The student must respect the privacy of classmates' educational records at all times.
8. Honesty and Integrity
   - The student must be honest and transparent in all interactions with faculty, staff, patients, and peers.
   - The student must not misrepresent facts, actions, or circumstances in any setting.
9. Clinical Documentation Accuracy
   - The student must ensure that all clinical documentation accurately reflects her true role in patient care.
   - The student must not document herself as a secondary provider when she is acting as the primary provider.
10. Didactic Assessment Conduct
    - The student must sit in the assigned seat during all didactic assessments.
    - Assessment instructions must be followed exactly as provided.
11. Professional and Personal Boundaries
    - The student must honor and respect the personal and professional boundaries of faculty, staff, patients, and fellow students.
    - The student must not use a personal mobile phone or any electronic device to take photographs, videos, or recordings of patients, students, faculty, or staff under any circumstances.

*Failure to meet deadlines, standards, or to complete the requirements as listed above will result in an immediate change from "Clinical Monitoring" to "Clinical Probation". In addition, a "No-Pass" will be issued for the current DMD 6402 block and/or the DMD 6403 block. Student should recognize graduation may still be delayed due to excessive absences, even with successfully completing the requirements given with this "Clinical Monitoring."*

**Expected Resolution Date**

06-12-2026

**Action Plan Meeting Signatures**

It is our intent to give you every opportunity to succeed, and we are hopeful that this Action Plan will facilitate your rapid progress and development towards independence.

Signatures:

_____          Date _____   Time _____
Faculty Signature

_____          Date _____   Time _____
Faculty Signature

_____          Date _____   Time _____
Faculty Signature

_____          Date _____   Time _____
Student Signature

10894 S. River Front Parkway | South Jordan, UT 84095 | 801-302-2600
roseman.edu

**EXHIBIT 12a**

**Qiu Email to Roseman — Clarification re: Significant Infraction (January 14, 2026) — Page 1 of 7**

 ROSEMAN UNIVERSITY
OF HEALTH SCIENCES

Yuyang Qiu <yqiu993@student.roseman.edu>

## Clarification regarding Significant Infraction: Allegation of treating patient's right side without faculty approval during scheduled lower left SRP

3 messages

**Yuyang Qiu** <yqiu993@student.roseman.edu>
To: Rachel Novak <rnovak@roseman.edu>

Wed, Jan 14, 2026 at 6:33 AM

Dear Dr. Novak,

## Urgent Request to Preserve Evidence

Before detailing the events of Friday, January 9, 2026, I respectfully request that the administration secure and preserve the clinic surveillance footage from **Clinic 3A between the hours of 8:00 AM and 10:00 AM.** This footage will provide objective confirmation of the interactions between myself, the patient, and the faculty during the start check. We were in Operatory 5 that day.

I would like to express my sincere gratitude for the opportunity to meet on January 13th. To ensure that I am addressing the administration's concerns with the utmost accuracy and thoroughness, I have summarized my understanding of the point raised regarding the clinical session on Friday, January 9th.

I am writing to provide the documentation requested to assist with and expedite the current investigation. Based on our meeting on 1/13/2026 (Tuesday), I have summarized the details below according to my best recollection and understanding of the discussion. It is my understanding that the core reason for the "Significant Infraction" is centered specifically on **the allegation of treating a patient's right side and administering anesthesia without faculty approval on Friday, while the scheduled plan was for an SRP on the lower left**. I am providing this response with the understanding that these points above constitute the full scope of the concerns raised during our meeting. If there are any additional allegations or information that were not covered or that I may have misunderstood, please let me know so that I can provide a truly comprehensive response.

Please find **attached** a factual summary of the events of January 9th, the evaluation comments posted by the faculty on Sunday evening at approximately 11:00 PM, and the follow-up email I sent to the faculty shortly after reviewing those comments to provide necessary clarification and details.

Thank you again for your patience and for allowing me to clarify this event. I truly appreciate the opportunity to provide this additional context. I am deeply sorry for the additional workload and disruption this situation has caused you and the rest of the administration.

---

📄 **Clarification regarding Significant Infraction for Jan 9, 2026.pdf**
676K

**EXHIBIT 12b**

**Qiu Email to Roseman — Clarification re: Significant Infraction (January 14, 2026) — Page 2 of 7**

---

**Rachel Novak** <rnovak@roseman.edu>                    Wed, Jan 14, 2026 at 8:46 AM
To: Yuyang Qiu <yqiu993@student.roseman.edu>
Cc: Clark Dana <cdana@roseman.edu>

Hello Ellie,

Thank you for this information. It will be very helpful. I will reach out in the next day or so with an update.

I hope you have a good day. Please use some of your free time today to make an appointment with TalkSpace.

Dr. Novak

**Rachel Tomco Novak, PhD, MS**

Associate Dean, Enrollment and Student Success

Associate Professor, Biomedical Sciences

Roseman University of Health Sciences

College of Dental Medicine

10894 S. River Front Parkway, South Jordan, UT 84095

Office: 801-878-1296, D-528

rnovak@roseman.edu

*Transforming* Education. *Reimagining* Healthcare.

*Embracing* Discovery. *Committed* to Community.

www.roseman.edu

---

**From:** Yuyang Qiu <yqiu993@student.roseman.edu>
**Sent:** Wednesday, January 14, 2026 6:33 AM
**To:** Rachel Novak <rnovak@roseman.edu>
**Subject:** Clarification regarding Significant Infraction: Allegation of treating patient's right side without faculty approval during scheduled lower left SRP

## EXHIBIT 12c

### Qiu Email to Roseman — Clarification re: Significant Infraction (January 14, 2026) — Page 3 of 7

Clarification regarding Significant Infraction: Allegation of treating patient's right side without faculty approval during scheduled lower left SRP

## Urgent Request to Preserve Evidence

Before detailing the events of Friday, January 9, 2026, I respectfully request that the administration **secure**, **preserve**, and **review** the clinic surveillance footage from **Clinic 3A,** especially any angles that capture the entrance and exit of Operatory 5 **between the hours of 8:00 AM and 10:00 AM.** This footage will provide objective visual and audio confirmation of the interactions between myself, the patient, and the faculty during the start check. We were in Operatory 5 that day.

The patient's chart number: ████████. Their **LR SRP has already been completed** on 12/10/2025. The restoration we did on 1/9/2026 was #31 B (in the LR quadrant).

If possible, I would welcome the administration to contact the patient directly for independent verification of the patient's strong and persistent desire.

## Jan 9, 2026 - Friday (Recap of the Clinical Session)

Below is a summary of what actually happened that day:

### Before I brought the patient back
I checked with the faculty about bringing the patient in, and they gave me the go-ahead.

### The Initial Interaction

I confirmed that he was scheduled for a deep cleaning (SRP) on the lower left. The patient immediately and persistently redirected the treatment priority, stating: "Oh no, I have a hole, I need to fix that... cause I don't want to have it get worse." I asked for clarification if he truly wanted to prioritize the restoration, and he confirmed that avoiding the deterioration of that "hole" was his primary concern.

After the patient arrived, I confirmed his appointment for the scheduled SRP. However, the patient was very insistent on his own priority.

- I confirmed with the patient whether he's here for a LL SRP.
- **Patient said:** 'Oh no, I have a hole, I need to fix that... cause I don't want to have it get worse.'
- **My response:** 'Oh, you want to fix the hole first?'
- **Patient confirmed:** 'Uh huh, cause I don't want to have it get worse.'

**The Start Check with Dr. Allen (Time: around 8:30AM)**

50

## EXHIBIT 12d

### Qiu Email to Roseman — Clarification re: Significant Infraction (January 14, 2026) — Page 4 of 7

In **Op 5**, Dr. Allen performed the start check. During the start check, **the faculty, the patient, and I were all present.** He spoke directly to the patient about the change in treatment plan.

- **The Patient stated:** 'I think it's a priority to fill the hole first.'
- **Dr. Allen asked:** 'Is it sensitive?'
- **The Patient explicitly replied: 'No, not for now, but I don't want to have it get worse.'**
- **Dr. Allen said:** "Oh, that one. Okay. We'll leave the cleaning for next time."
- Dr. Allen acknowledged this and approved the restoration on #31. I proceeded based on this direct faculty-patient communication. Of note, **the LR SRP has already been completed on 12/10/2025 according to the patient chart**. The restoration that we performed on that day was #31 B (on the LR quadrant).

**When the hygienist came by and started questioning the treatment plan**

When the hygienist passed by and asked whether I'm doing an SRP today, I explained that the patient had expressed a strong preference to address the restoration first due to the "hole" in his tooth. I proactively suggested to the hygienist that we could verify this patient preference with Dr. Allen and then immediately went to locate the faculty myself to ensure the treatment plan was properly coordinated.

**So I went to the faculty again, and the faculty confirmed with the hygienist the filling treatment plan and the patient's preference for prioritizing the filling.**

**After everything was confirmed, we were about to start (Time: around 8:40 AM).**

**EXHIBIT 12e**

**Qiu Email to Roseman — Clarification re: Significant Infraction (January 14, 2026) —
Page 5 of 7**

## Evaluation given on 1/11/2026 (Sunday at around 11 PM)

The evaluation confirms that the supervising faculty member approved of me to proceed with the treatment of tooth #31.



**Daily Evaluation Submission**

**Institutional Asses...** Sun, Jan 11, 10:54 PM (3 days ago)
to me ▾

Yuyang Qiu (yqiu993@student.roseman.edu), You have been evaluated by Dr. Thomas Allen. Please see your attached evaluation for further details. Thank you, Institution Outcomes Team *This is an automated message from the Roseman CODM Institutional Outcomes account. If you have received this message in error or have concerns, please e-mail Dr. Ferguson at aferguson@roseman.edu. CONFIDENTIALITY: This e-mail (including any attachments) may contain confidential, proprietary, and privileged information, and unauthorized disclosure or use is prohibited. If you received this e-mail in error, please notify the sender and delete this e-mail from your system.

**2 Attachments** · Scanned by Gmail ⓘ    ↓    Add all to Drive

noname        Evaluation ID#36...

**Additional Comments**
Patient was scheduled for scaling. Student represented that patient was in pain lower right #31 had a hole in the tooth he wanted it taken care instead of scaling due to pain. Told student to go ahead and treat # 31 today because of his complaint of pain. Student administered local anesthetic and prepped tooth. Upon checking preparation patient was asked about pain in tooth and he stated that tooth didn't bother him, no pain he just gets food caught in hole. Had student fill tooth, restoration was clinically acceptable. After finish check student requested to do fillings #18 and #19. Patient and student were told scaling must be completed first before any more restorations are done as per school policy. Patient agreed and scheduled scaling appointment. Student informed in future scaling must be completed first before any other treatment.

## EXHIBIT 12f

### Qiu Email to Roseman — Clarification re: Significant Infraction (January 14, 2026) — Page 6 of 7

## My Email to Dr. Allen

Below is the email I sent to Dr. Allen after receiving his evaluation comments Sunday night regarding the appointment on 1/9/2026. **I reached out proactively at that time, before I was notified of any formal concerns regarding a "significant infraction", to provide supplementary details**: 1) LR SRP was completed on 12/10/2025. 2) I also provided further context regarding the patient's perspective: specifically, that filling the "hole" was his priority.

Regarding the Evaluation Comments for the Patient on 1/9/2026                                    ✕  🖨  ☑

 **Yuyang Qiu** <yqiu993@student.roseman.edu>          Mon, Jan 12, 3:07 AM (1 day ago)   ☆   ↩   ⋮
to tallen2 ▾

Dear Dr. Allens,

I hope you're having a good start to your week.

I am writing to you because I noticed the detailed comment in my evaluation from Friday morning's session with that patient. I wanted to reach out primarily to ensure our records are perfectly aligned and to share some details that might have been lost in the shuffle of such a busy morning.

First, I noticed a few details that I wanted to bring to your attention. I was relieved to confirm in the patient chart that the **patient's Lower Right (LR) SRP had actually been completed in a previous session** (I will double check this again after I arrive at the clinic this morning). I apologize if I didn't make that clearer during our start check. I know how hectic it was for you while you were **graciously covering both Team 17 and Team 18.**

### Patient's Repeated and Consistent Request for #31 Restoration and Clear Confirmation of Being Asymptomatic (No Pain) at Start Check

Regarding the patient's chief complaint, I recall his strong preference for the filling. **In the waiting room**, when I confirmed whether he's here for the Lower Left (LL) SRP, he said: *"Oh no, I have a hole, I need to fix that... cause I don't want to have it get worse."*

Most importantly, I want to clarify my own communication to ensure I am meeting your expectations. During our Start Check, my intention was to advocate for his request to prevent further decay. In fact, during our **Start Check**, I remember the patient explicitly telling both you and I: *"I think it's a priority to fill the hole first."* During the Start Check, the patient also said the following line to both you and I: *"No, it's not sensitive for now, but I don't want to have it get worse."* This confirmed that the patient was entirely asymptomatic at the time of our Start Check. Despite the lack of pain, he was quite persistent in voicing his concern about the "hole" in his tooth. Both in the **waiting room** when I went to bring him back, and in the **operatory** itself when both you and I were present, the patient repeatedly emphasized that repairing it was his top priority for the visit, as he was very anxious about the cavity deteriorating further if not addressed immediately.

We are all truly inspired by your dedication in supervising both teams simultaneously that day. It is remarkable how you manage to provide such high-quality guidance to so many students at once. I can only imagine how exhausting it must be to track every detail across two different teams. I value your guidance so much that I wanted to provide these additional details simply to ensure that our clinical records are as comprehensive as possible and reflect the full scope of the patient's requests.

I am **always here to support your clinical decisions** and want to ensure that your hard work and our patient's actual status are perfectly documented.

Thank you again for your incredible guidance and support, and for everything you teach us.

53

## EXHIBIT 12g

### Qiu Email to Roseman — Clarification re: Significant Infraction (January 14, 2026) — Page 7 of 7



**Yuyang Qiu** <yqiu993@student.roseman.edu>          Mon, Jan 12, 8:20 AM (1 day ago)   ☆   ↰   ⋮
to tallen2 ▾

Dear Dr. Allen,

Just as a follow-up to my previous email to you in this thread, I just double checked the patient chart again today and noticed that the patient had the **LR SRP** completed on 12/10/2025. Thank you.

In conclusion, the restoration performed on tooth #31 B was a direct result of the patient's explicit and persistent requests, made in the presence of both the faculty and myself, and the procedure was only initiated after I received formal faculty approval to modify the day's treatment plan. Consequently, I believe the allegation of a "Significant Infraction" is inconsistent with the actual events of the clinical session. I would greatly appreciate it if the committee conduct a thorough investigation to restore the facts of the matter by reviewing the clinic surveillance footage, examining the patient's records (which confirm that the LR SRP had already been completed on 12/10/2025) or contacting the patient directly to verify these details.

Thank you for your time and for your diligence in reviewing this case, and I sincerely apologize for the additional work and inconvenience this situation has caused the administration and committee.